UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| United States of America, | | Case: 2:22−cr−20621 Assigned To : Leitman, Matthew F. |
| Plaintiff, | Case No. | Referral Judge: Patti, Anthony P. |
| v. | | Assign. Date : 11/17/2022 |
| Zaki Maalouf, | VIO:  18 U.S.C. § 371 | Description: INFO USA V. SEALED (KB) |
| Defendant. | | |

_____

# INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

## General Allegations

At all times relevant to this Information:

### The Medicare Program

1.  The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age or over or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3. Medicare covered different types of benefits and was separated into different program "parts": hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

4. Specifically, Medicare Part B covered the cost of physicians' services, medical equipment and supplies, and diagnostic laboratory services.

5. First Coast Service Options, Inc., was the Medicare contractor that processed and paid claims involving Part B services, including diagnostic laboratory services, provided in Florida, from at least May 2015, through at least May 2021.

6. SafeGuard Services, LLC, the Medicare Unified Program Integrity Contractor covering Florida, from 2017, through 2021, was responsible for performing investigations and audits designed to protect Medicare from fraud, waste, and abuse.

7. Upon certification by Medicare, a service provider, including clinics, physicians, and laboratories (collectively, "providers"), was assigned a provider identification number for Medicare billing purposes (referred to as a "National Provider Identifier" or "NPI"). When the provider rendered a service, the provider submitted a claim for reimbursement to the Medicare contractor or carrier that included the NPI assigned to that provider.

8.      A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and identification number of the physician or other provider who had ordered the services. When an individual provider was associated with a clinic and medically necessary services were provided at that clinic's location, Medicare Part B required that the provider numbers associated with the clinic be placed on the claim submitted to the Medicare contractor.

9.      By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement and certified that they would not knowingly present, or cause to be presented, false and fraudulent claims.

10.     As a requirement to enroll as a Medicare provider, Medicare required providers to agree to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that a payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Accordingly, Medicare would not pay claims procured through kickbacks and bribes.

11.     Providers were given, and provided with online access to, Medicare manuals and services bulletins describing proper billing procedures and billing rules

and regulations.  Providers could only submit claims to Medicare for reasonable and medically necessary services that they rendered.  These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the provider.

12. Medicare only covered services that were both medically necessary and rendered.

13. In order to receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form (e.g., a CMS-1500 form or UB-92) containing the required information appropriately identifying the provider, beneficiary, and services rendered.

### Medicare Urine Drug Testing

14. Under Medicare Part B, for a laboratory to properly bill and be paid by Medicare for laboratory testing, the beneficiary must, among other things, qualify for the testing under Medicare's established rules and regulations. The testing also must be rendered according to Medicare's rules and regulations, and certain documents must be completed before a claim is submitted for reimbursement to Medicare.

### The Physician Business

15. Infinity Visiting Physician Services, PLC ("Infinity"), was a Michigan company doing business in Farmington Hills, Michigan, and elsewhere, in the

Eastern District of Michigan. Infinity was enrolled as a participating provider with Medicare and submitted claims to Medicare.

### The Laboratory

16. Company 1 was a Florida limited liability company doing business in the Eastern District of Michigan. Company 1 was a toxicology laboratory enrolled as a participating provider with Medicare and submitted claims to Medicare.

### Defendant and Other Individual

17. Defendant **ZAKI MAALOUF**, a resident of Wayne County, Michigan, was a medical assistant working on behalf of Infinity.

18. Co-Conspirator 1, an individual whose identity is known to the United States and a resident of Oakland County, Michigan, controlled, owned, or operated Infinity.

19. Lab Co-Owner 1, an individual whose identity is known to the United States and a resident Wayne County, Michigan, was a minority owner of Company 1 and performed marketing services on behalf of Company 1.

20. Lab Co-Owner 2, an individual whose identity is known to the United States and a resident of Oakland County, Michigan, was a minority owner of Company 1 and performed marketing services on behalf of Company 1.

5

## COUNT 1
## (18 U.S.C. § 371—Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks)

21. Paragraphs 1 through 20 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

22. Beginning in or around June 2017, and continuing through in or around March 2019, in Wayne and Oakland Counties, in the Eastern District of Michigan, Co-Conspirator 1 did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Lab Co-Owner 1, Lab Co-Owner 2, **ZAKI MAALOUF** and others known and unknown to commit certain offenses against the United States, that is:

   a. to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services, by and through the CMS, in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371; and

   b. to offer and pay remuneration, including kickbacks, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and (ii) to purchase,

6

lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and (B).

## Purpose of the Conspiracy

23.  It was a purpose of the conspiracy for **ZAKI MAALOUF**, Co-Conspirator 1, Lab Co-Owner 1, Lab Co-Owner 2, and their co-conspirators to unlawfully enrich themselves by: (a) offering, paying, receiving, and soliciting, kickbacks to ensure that Medicare beneficiaries' urine samples were referred by Infinity to Company 1 for drug testing; (b) submitting or causing the submission of claims to Medicare for drug testing of urine samples referred to Company 1 as a result of the payment of kickbacks; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendant's co-conspirators.

## Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

24.  Between in or around June 2017 and in or around March 2019, Co-Conspirator 1, Lab Co-Owner 1, Lab Co-Owner 2, and others, negotiated, calculated, and agreed to facilitate and facilitate and conceal the payment of kickbacks from Company 1 to Infinity, in the form of both checks paid to Infinity

and payment of salaries of IVPS employees, including **ZAKI MAALOUF**, in exchange for urine samples and physician orders from IVPS to be sent to Company 1 for the purpose of submitting claims to Medicare.

25.  Between in or around June 2017 and October 2017, **ZAKI MAALOUF** was paid illegal kickbacks in the approximate amount of $7,405.30 by Company 1, while exclusively performing work on behalf of Infinity.

26.  **ZAKI MAALOUF**, Co-Conspirator 1, and others knew and understood that it was illegal to pay or receive kickbacks in exchange for the referral of beneficiaries or the arranging for orders for drug testing.

27.  **ZAKI MAALOUF**, Co-Conspirator 1, and others devised and participated in a scheme to pay and receive illegal kickbacks in exchange for urine samples and physician's orders for urine drug testing to be sent from Infinity to Company 1 for the purpose of billing Medicare.

28.  **ZAKI MAALOUF**, Co-Conspirator 1, and others concealed and disguised the illegal kickback scheme by entering into sham contracts and agreements, including by arranging for **ZAKI MAALOUF's** salary for work performed on behalf of Infinity to be paid by Company 1, in exchange for the referral of urine samples and physician orders for urine drug testing from Infinity to be sent to Company 1 for the purpose of submitting claims to Medicare.

29. Between in or around June 2017 and October 2017, **ZAKI MAALOUF** and others submitted or caused the submission of false and fraudulent claims to Medicare in the approximate amount of $435,948.00 that were procured through the payment of illegal kickbacks and ineligible for reimbursement. Medicare paid Company 1 approximately $111,757.05.

### Overt Acts

30. In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed in Wayne and Oakland Counties, in the Eastern District of Michigan, and elsewhere, at least one of the following overt acts, among others:

31. In or around June 2017, **ZAKI MAALOUF** agreed with Co-Conspirator 1 to receive salary payments from Company 1 for work performed exclusively on behalf of Infinity.

32. In or around June 2017, **ZAKI MAALOUF** completed W-4 tax forms and submitted the forms to Company 1, for the purpose of receiving salary payments from Company 1 for work performed exclusively on behalf of Infinity.

33. On or about at least the following dates, **ZAKI MAALOUF** accepted from Company 1 the payments set forth below as compensation for work performed exclusively on behalf of Infinity:

|    | Date | Amount |
|----|------|--------|
| a. | June 30, 2017 | $661.97 |

| b. | July 14, 2017 | $911.13 |
| c. | July 28, 2017 | $919.66 |
| d. | August 11, 2017 | $840.39 |
| e. | August 25, 2017 | $605.11 |
| f. | September 8, 2017 | $658.14 |
| g. | September 22, 2017 | $897.58 |
| h. | October 6, 2017 | $348.18 |

All in violation of Title 18, United States Code, Section 371.

### FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461
### 18 U.S.C. § 982(a)(7))

34. The allegations contained in this Information are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture against the defendant **ZAKI MAALOUF**, pursuant to Title 18, United States Code, Section 981, and Title 28, United States Code, Section 2461, and Title 18 United States Code, Section 982(a)(7).

35. Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), together with Title 28, United States Code, Section 2461, as a result of the foregoing violation as charged in Count 1 of this Information, the defendant, **ZAKI MAALOUF**, shall forfeit to the United States: any property, real or personal (a) which constitutes or is derived from proceeds traceable to the commission of the offense, and (b) that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

36. Such property includes, but is not limited to, a forfeiture money

judgment, in the amount of $7,405.30, representing the total amount of proceeds and/or gross proceeds obtained as a result of the defendant's violation as charged in Count 1 of this Information.

37.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, **ZAKI MAALOUF**, shall forfeit substitute property, up to the value of the properties described above or identified in any subsequent forfeiture bills of particular, if, by any act or omission of the defendant, the property cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property that cannot be subdivided without difficulty.

DAWN N. ISON
UNITED STATES ATTORNEY

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

REGINA R. MCCULLOUGH
Chief, Health Care Fraud Unit
United States Attorney's Office
Eastern District of Michigan


 s/ Shankar Ramamurthy
SHANKAR RAMAMURTHY
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (202) 924-5368
Email: shankar.ramamurthy@usdoj.gov

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | Case Number |
|---|---|---|

**NOTE:** It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | **Judge Assigned:** |
| ☐ Yes    ☒ No | **AUSA's Initials:** |

**Case Title:** USA v. Zaki Maalouf

**County where offense occurred:** Oakland and Wayne

**Check One:**   ☒ Felony     ☐ Misdemeanor     ☐ Petty

____Indictment/ ✓ Information --- **no** prior complaint.
____Indictment/____Information --- based upon prior complaint [**Case number:**                    ]
____Indictment/____Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

**Superseding Case Information**

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

November 17, 2022
Date

Shankar Ramamurthy
Trial Attorney
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: 202-924-5368
E-Mail address: shankar.ramamurthy@usdoj.gov
Attorney Bar #: IL 6306790

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.